Foster, Appellant, *v.* State College Borough et al.

Argued October 28, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*James C. Furst,* for appellant.

*Frank R. Ambler,* for appellees.

OPINION BY KELLER, P. J., January 29, 1937:

This case was here before, and is reported in 110 Pa. Superior Ct. 452, 168 A. 693. We sent it back to the Workmen's Compensation Board to take additional testimony and make more specific findings of fact on

the question whether the death of claimant's husband was due to unusual exertion, while in the course of his employment as fire marshal of State College Borough. After taking additional testimony the board made, inter alia, the following findings of fact:

"4. On March 21, 1930, the Pennsylvania State College was engaged in completing the construction of a modern heating and power unit on the corner of College Avenue and West College Drive, adjacent to the University Club, to take the place of an old power plant that had been partially destroyed by fire in 1918. This was an imposing fire proof structure, of modernistic design, built at a cost, according to the College records, of approximately $800,000. Inside the building was a construction shanty used by the boiler erectors, as well as scaffolding and lumber inside the building that was inflammable. On this day, at approximately 1:00 o'clock P. M. a fire broke out in this shanty, causing an unusual quantity of very heavy smoke to roll from the building, and the Volunteer Fire Company was summoned in response to a fire alarm—heavy blasts from a whistle or siren similar to a fog signal, which are audible for a considerable distance.

"5. When the fire alarm was sounded the decedent had just finished his dinner. He had advised his son by letter the day before that the Chief of the Fire Company, Harry Resides, had been taken ill and that he had lost a valuable man. He left his table and ran to the fire, which was approximately a square from his home. On arriving at the scene of the conflagration, which then had an alarming and baffling appearance, he picked up a fire hose and pulled it from the rear of the truck to the fire plug, about 15 or 20 feet, and gave instructions to see that the hose did not kink. He then dropped dead of an acute heart attack, superinduced by the exertion of running to the fire and pulling the hose from the truck to the fire plug, an

exertion which was more or less serious directly following the noon-day meal, and which was further aggravated by the alarming appearance of the new building and the loss of the Fire Chief.

"6. In this case the decedent did more than perform his ordinary duties in the usual way, and his death was the result of something more than the collapsing of an impaired heart subject to a certain but not unusual strain. He was, in the opinion of an able physician who had talked to him a day or two before, in usual health. He ran from his home following the noon-day meal, which is always more or less dangerous for a man suffering with heart disease, and attempted to assume not only the duties as Fire Marshal, but the duties of the absent Fire Chief. He was confronted with the possible destruction of a new building of no mean cost; he had expressed concern over the loss of the Fire Chief; and we think it is a fair inference that he sensed an additional responsibility, and exerted himself more than he customarily would have done, particularly with the knowledge that he had of the existing heart disease."

These findings supported the previous award of compensation to the widow. On appeal to the court of common pleas, the findings, conclusions and award of the board were set aside, on the ground that the evidence showed that it was the ordinary duty of the fire marshal to get to every fire as quickly as he could, and when there, if necessary, to do everything that an ordinary fireman would be required to do; that the decedent had done nothing on this occasion that he had not done at other fires; and that the testimony on behalf of claimant went no further than to show "natural exertion incident to discharging his usual duties." The claimant appealed. On further consideration of the case a majority of this court is of opinion that the judgment of the lower court should be re-

versed and judgment entered on the award of the board in favor of the claimant.

The claim was presented under the authority of the Act of May 14, 1925, P. L. 714, which provides that all members of volunteer fire companies of cities, boroughs, etc. shall be employees of such municipalities within the meaning of the Workmen's Compensation Act, and shall be entitled to receive compensation in case of injuries received while actually engaged as firemen or while going to or returning from any fire which the fire companies of which they are members shall have attended. See *Sonnett v. Stowe Twp.*, 100 Pa. Superior Ct. 397; *Sames v. Boro of Perkasie*, 100 Pa. Superior Ct. 402.

Claimant's husband, Philip D. Foster, was regularly employed in the Borough of State College by the State Workmen's Insurance Fund. He was also chief fire marshal of the borough, and a member of the volunteer fire company. He was sixty-seven years old, by appearance a hale, vigorous man, but, several years before, he had had an attack of angina pectoris, and had been advised by his family physician not to over-exert himself. Since then, while he had occasional heart attacks, they were not serious enough to call in a physician. We may add that angina pectoris is not itself a specific disease. It is a violent paroxysm of pain arising frequently from some disease of the coronary arteries. It is a manifestation of disease rather than a recognized disease in itself.

On the day of this fire, Foster had just finished his dinner when the alarm sounded. The fire was a little over a block away. The building on fire was a new one, not quite completed and the volume of smoke arising from it indicated a serious conflagration. He ran to the scene of the fire, and when he arrived at the pumper ran around it, picked up a section of hose and started to pull it toward the fire, called out to his men to

watch out that the hose did not kink, and fell over dead. Physicians testified that he died from dilatation of the heart or a rupture of the heart wall, and in either event, that the exertion of running to the fire and pulling the hose had precipitated or contributed to his death. There was no reasonable doubt that his death was the result of his exertion in running to the fire and his activities at the fire. The dispute seems to be whether this exertion was unusual or not.

The trouble seems to be due to an attempt to apply to an irregular, unusual and intermittent employment, such as a volunteer fireman, the rules applicable to regular and usual occupations, and because fitfully or spasmodically, at irregular times, a fireman may be called upon to do work which requires great or unusual exertion, to hold that such unusual exertion is his regular, normal activity. No such rule should be applied. There are many cases in the reports which hold that even in occupations where hard, prolonged physical labor is the usual, normal and accustomed thing, compensation will be allowed when the death of the employee results from some exertion unusual to his daily work. Thus it is well known that miners are accustomed to hard, prolonged physical labor, yet awards of compensation to the dependents of a miner have been sustained where the employee died following some exertion different from or in excess of his usual work; such as where the mine car he was pushing became wedged against the roof of the mine from an overload *(Kotkoskie v. Northwestern Mining & Exchange Co.,* 105 Pa. Superior Ct. 480, 161 A. 480) ; or where he was trying to split a rock with a pick *(Honis v. Coxe Bros. & Co.* 95 Pa. Superior Ct. 209) ; or where he aggravated an abdominal tumor by retracking a mine car *(Bartlinski v. Northumberland Mining Co.,* 117 Pa. Superior Ct. 437, 177 A. 518) ; or where death resulted from a cardiac collapse following overlifting

(*Tracey v. Phila. & R. C. & I. Co.,* 270 Pa. 65, 112 A. 740) ; or where it resulted from a collapse following a climb of stairs from the mine pit (*Watkins v. Pittsburgh Coal Co.,* 278 Pa. 463, 123 A. 461) ; or where the strain in pushing a loaded mine car produced an increase in blood pressure which resulted in the rupture of an artery (*Samoskie v. Phila. & R. C. & I. Co.,* 280 Pa. 203, 124 A. 471). So, too a truck driver hauling coal from a mine, who by himself lifted a heavy scoop, weighing 200 pounds, which ordinarily was handled by two men, and died within three minutes, was held to have died by accident (*Durga v. Williams,* 89 Pa. Superior Ct. 156) ; so was a man, who died from dilatation of the heart following his turning a windlass by a crank, in pulling a heavy oak timber for a mine prop (*Calderwood v. Consolidated Lumber & Supply Co.,* 91 Pa. Superior Ct. 189). In *Murphy v. Phila. & R. C. & I. Co.,* 98 Pa. Superior Ct. 109, a miner whose left side was paralyzed while shoveling coal a distance of ten feet, over a five foot board partition, was held entitled to compensation. In *Hughes v. Prizer-Painter Stove Works,* 109 Pa. Superior Ct. 53, 165 A. 527, a watchman was put to work cleaning scale from a boiler in half-hour shifts and died from dilatation of the heart and the death was held accidental. In *Kummerer v. Snyder,* 117 Pa. Superior Ct. 28, 177 A. 232, a truck driver accustomed to heavy labor died from dilatation of the heart aggravated by over-exertion, while doing work of an unusual nature, and the death was held accidental. In *Barr v. Atlantic Elevator Co.,* 124 Pa. Superior Ct. 57, 187 A. 815, a man employed by an elevator company as an inspector and repair man, died from a heart attack following his carrying four new wire cables up a flight of stairs, and his death was held compensable. In *Melini v. Saltsburg Coal Mining Co.,* 119 Pa. Superior Ct. 356, 181 A. 330, compensation was allowed where

a miner sprained his back in lifting a heavy piece of 'boney'. See also *Viehdorfer v. Cherry Run Coal Co.*, 125 Pa. Superior Ct. 201, 189 A. 782.

In all of these cases, and many more which could be cited, it must not be thought that the employee had never before done what he was doing when his over-exertion resulted in death; but it was not his usual regular, everyday work. Frequently such men are required to do something out of the ordinary line of their work, requiring extra exertion, and no harm comes from it; but when something does go wrong in the body as a result of such extra or over-exertion, the law regards it as accidental for purposes of workmen's compensation.

It is unreasonable to hold, because a fire marshal or a fireman may run to a fire when he hears a fire alarm, that such running is his usual, ordinary, customary and everyday work. There may be a fire, including small scares from overheated flues, etc. every five or six days,[1] and to get to it the fireman may run at top speed for a few—five or ten—minutes, and then run no more for the next five days or week. To hold that while he is running he is doing only his usual, ordinary and everyday labor is to misapply the rule abovementioned. Even a paid fireman, who devotes his whole time to such employment, spends most of his time about the engine house, seeing that equipment is in order, and in drills and in waiting for calls and alarms, and over-exertion in running to a fire on his part, or hurriedly climbing a ladder, or handling heavy hose, if it resulted in dilatation of the heart or cardiac collapse would be accidental, notwithstanding that, in the line of his duty, he is called upon to do it occasionally, but not regularly, or day in and day out, as part of his

---

[1] Witnesses testified that, roughly speaking, there might be from sixty to seventy-five fires, of all sorts and degrees, in a year, in the Borough of State College.

usual, ordinary and accustomed work. It is unfair and unreasonable, in the very nature of things, to apply to an inherently irregular, intermittent and unusual employment such as this the rules laid down for regular, stable, usual and continued occupations.

Keeping this in mind we think there is evidence in the record to support the board's findings, and in that event their findings are not subject to reversal by the court below or by us, and 'the award should be sustained.

The judgment is reversed and the record is remitted to the court below with directions to enter judgment in favor of the claimant on the award in accordance with the provisions of the Workmen's Compensation Law.

Judges BALDRIGE, STADTFELD and PARKER dissent.